**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**REBECCA STERLING**                                                                    **PLAINTIFF**

**v.**                              **Case No. 4:19-CV-00025-LPR**

**BOARD OF TRUSTEES OF THE
UNIVERSITY OF ARKANSAS, et al.**                                   **DEFENDANTS**

## ORDER

This is an employment discrimination case.  Plaintiff Rebecca Sterling alleges violations of the Age Discrimination in Employment Act, the Rehabilitation Act, the Americans with Disabilities Act, and the Family and Medical Leave Act.  Defendants—the Board of Trustees of the University of Arkansas, the members of the Board of Trustees, and Dr. Bentley Wallace—deny engaging in any type of discrimination.[1]

This case was filed back in January of 2019.  But it was only transferred to me in August of 2022.  The judge initially assigned to this case handled it through the summary-judgment stage.  She issued an Opinion and Order in October of 2020, granting in part and denying in part Defendants' Motion for Summary Judgment.[2]  For present purposes, the critical part of the October 2020 ruling held that "qualified immunity is not available to defendants on an FMLA claim."[3]

---

[1] The University of Arkansas-Pulaski Technical College was also a defendant in this action.  But it has been dismissed from the case.  Both parties agree that it is not an entity that can be sued.  *See* October 2020 Op. & Order (Doc. 19) at 7–8.

[2] Except as directed by the Eighth Circuit or otherwise necessary from the parties' subsequent concessions, I do not intend to revisit the conclusions of the October 2020 Opinion and Order.  Regardless of whether I would have come to the same conclusions in the first instance, there is no good justification for disturbing them at this point.  Of course, the October 2020 Opinion and Order's analysis is not binding on me at later stages of this litigation.

[3] October 2020 Op. & Order (Doc. 19) at 16.

Based on that proposition, Dr. Wallace was denied qualified immunity with respect to Ms. Sterling's claim against him.[4]

Dr. Wallace took an interlocutory appeal on the qualified-immunity issue.  The Eighth Circuit remanded after determining that a more extensive qualified-immunity analysis was needed at the district court level.[5]  Upon remand, and after transfer of the case to me,[6] I held a summary-judgment hearing focused on whether qualified immunity was appropriate in the specific circumstances of this case—that is, "whether the violative nature of [Dr. Wallace's] *particular* conduct [was] clearly established."[7]  I also invited the parties to simultaneously submit supplemental briefs on the issue.  They did so.[8]  For the reasons discussed below, Dr. Wallace is entitled to qualified immunity on Ms. Sterling's FMLA claim.

## BACKGROUND

With very limited additions or exceptions, this Order adopts and relies on the facts set out in the original summary-judgment decision and in the Eighth Circuit's decision.  The Court will briefly summarize those facts to the extent they are relevant to the qualified-immunity analysis. For the most part, they are not genuinely disputed.

Ms. Sterling has worked (in various roles) at the University of Arkansas-Pulaski Technical College since 2012.[9]  By the end of 2016, she had become the Co-Chair and Interim Dean of the College's Business Division.[10]  In those two roles, Ms. Sterling made a total salary of $76,000

---

[4] *Id.*

[5] *Sterling v. Bd. of Trs. of Univ. of Ark.*, 42 F.4th 901 (8th Cir. 2022).

[6] The judge initially assigned to this case recused on July 29, 2022.  *See* Order (Doc. 32).  The case was reassigned to me on August 2, 2022.  Notice of Reassignment (Doc. 37).

[7] *Sterling*, 42 F.4th at 905 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

[8] Pl.'s Suppl. Br. (Doc. 41); Defs.' Suppl. Br. (Doc. 42).

[9] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶¶ 2–4, 16.

[10] *Id.*; Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 10:11–12:22.

($70,000 for being the Interim Dean; $6,000 for being the department Co-Chair).[11]  In January of 2018, the College announced that it was going to restructure.[12]  This restructuring meant that Ms. Sterling's Interim Dean position would be eliminated shortly after the end of the academic year.[13]  It also meant that department chair positions would be vacated.[14]

Ms. Sterling met with some of her supervisors to discuss her post-restructuring options at the College.  Ms. Sterling was told that there would be new dean positions for which she could apply.[15]  But Ms. Sterling didn't consider that a real option.  She believed that she "wasn't qualified for" the new dean positions because she "didn't have a doctorate."[16]  Ms. Sterling was also informed that she could consider returning to a teaching position.[17]  But it was not clear at that time whether there would actually be a teaching position for Ms. Sterling.[18]  So, unless and until a guaranteed teaching spot materialized, Ms. Sterling felt she was "basically . . . going to be out of a job . . . ."[19]

While waiting to hear of a potential teaching spot, Ms. Sterling learned about an opening for a "nonacademic, staff position": the Coordinator of Community Education.[20]  Ms. Sterling viewed this position as an opportunity to "be a little bit creative" while still allowing for the

---

[11] *Id.* at 13:3–11.

[12] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 5.

[13] *Id.*

[14] Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 14:2–15:7.

[15] *Id.* at 14:18–22.

[16] *Id.*

[17] *Id.* at 14:2–17; Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 6.

[18] Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 15:14–25.

[19] *Id.* at 14:12–15:25; *see also id.* at 44:14–45:24.

[20] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 7.

exploration of teaching positions.[21]   Additionally, the Coordinator position paid more than the salary of a normal teaching role.   The Coordinator position paid $48,000 for a twelve-month appointment,[22] whereas Ms. Sterling's expected earnings for a teaching position at that time would have been approximately $40,000 for a nine-month appointment.[23]   All of this prompted Ms. Sterling to apply for the Coordinator position.[24]

Dr. Wallace was the hiring official for the Coordinator position.[25]   Although Dr. Wallace had the final say of who would be hired, applicants were interviewed by a five-member committee.[26]   The interview committee was composed of: (1) Dr. Wallace; (2) Elizabeth Reves; (3) Somerly Mustin; (4) Verkeytia Long; and (5) Reba Melton.[27]

Over forty people, including Ms. Sterling, applied for the Coordinator position.[28]   Such a large number of applicants could not efficiently be interviewed by the five-member committee. So Dr. Wallace screened the applications in order to narrow the field.[29]   Dr. Wallace enlisted committee member Elizabeth Reves to help him with this pre-interview screening process.[30]   Dr. Wallace and Ms. Reves each reviewed every application, independently selected the candidates

---

[21] Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 16:15–22.

[22] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 15.

[23] *See* Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 17:5–9; Ex. 15 (Faculty Position Description) to Defs.' Mot for Summ. J. (Doc. 8-9) at 1.   When the Court cites page numbers of an exhibit, it is referring to the page number of the exhibit itself, not the page numbers created by the ECF e-filing system.

[24] Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 16:15–22.

[25] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 8.

[26] *Id.* ¶¶ 8–10, 18–19; *see* Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 60:4–61:3.

[27] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶¶ 18–20.   At the time the events in this case occurred, Ms. Melton was known as Reba Treece.   *Id.* ¶ 19; Ex. 12 (Melton Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-8) at 5:11–13.

[28] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 17.

[29] Ex. 2 (Wallace Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-2) at 44:24–45:19; *see* Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 18.

[30] Ex. 2 (Wallace Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-2) at 45:12–19; Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 18.

they thought should be interviewed, and then compared notes.[31]  Dr. Wallace did not place Ms. Sterling on his list of candidates to interview.[32]  But Ms. Reves had chosen Ms. Sterling for her list and asked Dr. Wallace to include Ms. Sterling in the round of interviews.[33]  Dr. Wallace agreed to do so.[34]

On May 2, 2018, Dr. Wallace emailed Ms. Sterling to inform her that she would be interviewed on May 8 at 1:30 pm.[35]  About an hour after receiving this email, Ms. Sterling responded, "Bentley: I am sorry, is there another date than May 8?  I will be in El Dorado with my mother at her cancer doctor's appointment on that day."[36]  The next day, May 3, Dr. Wallace replied, "Sorry to hear that your mom is going through that.  Hope her treatments are bearable and successful.  I am checking with the interview committee to see if we can add you on Wednesday the 9th at 12:30.  Will report back later today once I've heard from the committee members."[37]

The rescheduling never came to pass.  That's because about one minute after Dr. Wallace sent his May 3 email, Ms. Sterling responded, "Bentley: Don't change it yet, I am checking to see if my sister can go with my mother on that date.  I should know something today.  THANKS!!"[38]  And the next day, May 4, Ms. Sterling told Dr. Wallace to "keep the [initial] time you scheduled."[39]

---

[31] Ex. 2 (Dr. Wallace Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-2) at 45:12–19.

[32] *Id.* at 83:10–15.

[33] *Id.* at 83:16–25.

[34] *Id.*

[35] Ex. 17 (Wallace-Sterling Emails) to Defs.' Mot. for Summ. J. (Doc. 8-9) at 3.

[36] *Id.* at 2.

[37] *Id.*

[38] *Id.* at 1.

[39] *Id.*

Dr. Wallace responded, "Great.  We'll see you at 1:30 on Tuesday the 8th."[40]  The interview took place on May 8, as scheduled.[41]

The candidate interviews were conducted over two days (May 8 and May 9, 2018) by the five-member committee.[42]  The committee jointly interviewed each candidate.  During or right after the interviews, every interviewer filled out a separate evaluation form (essentially a scorecard) for every candidate.[43]  Once all the interviews were over, the interviewers discussed the candidates' strengths and weaknesses.[44]  Although no hiring decision was made at that time, it

---

[40] *Id.*

[41] In its Opinion, the Eighth Circuit stated that Ms. Sterling "also took FMLA leave that day."  *Sterling*, 42 F.4th at 903.  The Eighth Circuit likely gleaned this from the summary judgment ruling made by the trial judge initially assigned to this case.  Her October 2020 Opinion and Order stated that it was "undisputed that Ms. Sterling . . . took FMLA leave on May 8, 2018 . . . ." (Doc. 19) at 22.  But, as both parties acknowledged at the post-remand hearing, there is nothing in the record to suggest Ms. Sterling took leave on May 8, 2018.  Aug. 12, 2022 Hr'g Tr. (Rough) at 13–14 (Dr. Wallace's counsel stating that Ms. Wallace "never even took the leave"); *id.* at 25 (Ms. Sterling's counsel stating there is not "anything in the record that says either way").  The slight mischaracterization in the October 2020 Opinion and Order—and the corresponding slight mischaracterization in the Eighth Circuit's Opinion—is the completely understandable result of the parties' ambiguously drafted statements of undisputed material facts.  Defendants' Statement of Material Facts Not in Dispute provides that Ms. Sterling "took FMLA leave during that time period." (Doc. 10) ¶ 23.  The ambiguous phrase, "during that time period," comes directly after two paragraphs discussing the events of May 2 through May 9, 2018.  *Id.* ¶¶ 21–23.  With that context in mind, it is easy to see how one would read Defendants' Statement of Material Facts Not in Dispute to say that Ms. Sterling took FMLA leave on May 8, 2018.  But that cannot be what Defendants were actually saying.  Defendants cite page fifty of Ms. Sterling's deposition to support the "during that time period" statement.  *Id.* ¶ 23.  At that point in her deposition, Ms. Sterling was testifying about the general process of obtaining FMLA certification and taking FMLA leave over the course of an entire year.  Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 49:23–51:6.  So, when Defendants said that Ms. Sterling "took FMLA leave during that time period," they were saying that she took FMLA leave during the "year period" between April 26, 2018, and April 26, 2019.  *Id.* at 50:1–4.  They were not saying anything about whether she actually took leave on or around May 8, 2018.

[42] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 21.

[43] *Id.* ¶ 25; Ex. 2 (Dr. Wallace Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-2) at 19:11–21; Ex. 11 (Reves Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-7) at 8:6–8.

[44] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 27.  It is unclear what role the numerical scores played in this discussion.  Dr. Wallace said the members shared their scores "as assistance in getting to the point of having a discussion.  And the points are just one portion of that conversation."  Ex. 2 (Dr. Wallace Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-2) at 21:5–7.  But then he immediately contradicted that statement and said that he "asked for opinion before [he] ask[ed] for numbers" because, when he is leading an interview committee, he "hold[s] the numbers to the end" so that the scores don't "influence the conversation."  *Id.* at 22:3–6.  Ms. Long's testimony was similarly confused.  She testified that the interviewers "went over . . . our scores and what we thought," but then also testified that the interviewers were not "told the other people's scoring" and that the discussion was "just more [of a] general conversation, not specifics like that."  Ex. 8 (Long Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-4) at 6:14–7:12.  Ms. Mustin testified that Dr. Wallace made a chart that logged each interviewer's scores, and that she "believe[d]" that Dr. Wallace made that chart "during," not after, the discussion.  Ex. 9 (Mustin Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-5) at 6:19–7:10.  Ms. Reves didn't really remember anything about the discussion at all.  Ex. 11 (Reves Dep.) to

became clear that there were two leading candidates: Ms. Sterling and Kristin Howell.[45]   Dr.

Wallace decided to take the evening to think things over.  The next morning, May 10, he informed

the committee that he had chosen Ms. Howell for the Coordinator position.[46]

Ms. Sterling felt that Dr. Wallace's decision simply didn't make sense.  She requested and

received from human resources the interviewers' scorecards.[47]  The scoring only added to Ms.

Sterling's suspicions.  Based on scoring, she had the edge over Ms. Howell.[48]  The final tally was

224 points for Ms. Sterling and 215 points for Ms. Howell.[49]  Moreover, Ms. Sterling's "lead" was

despite a very low score from Dr. Wallace.  While the other four interviewers each scored Ms.

Sterling at 45 or above out of 50, Dr. Wallace scored her a 34 out of 50.[50]  And the outlier nature

of the score cannot be explained simply by harder grading.  With respect to Ms. Howell, Dr.

Wallace's score was more in line with the rest of the committee.  The other four interviewers had

given Ms. Howell scores of 37, 42, 43, and 47.[51]  Dr. Wallace scored Ms. Howell a 46 out of 50.[52]

What was the conclusion Ms. Sterling drew from all this?  For some reason, Dr. Wallace had

intentionally deflated his personal score of Ms. Sterling in an attempt to knock her out of

---

Defs.' Mot. for Summ. J. (Doc. 8-7) at 10:25–11:18.  Ms. Melton said the discussion was "brief," and that "[a]t the end of the interviews, it was clear that [Ms. Sterling] had the highest points on the rubrics . . . ."  Ex. 12 (Melton Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-8) at 12:9–22.

[45] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 27.  Given that the record is unclear as to how the discussion among the interviewers unfolded, it isn't possible to say whether Ms. Sterling and Ms. Howell quickly became the two leading candidates based on their scores, the interviewers' comments to one another, or some combination of the two.  *See supra* note 44.

[46] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 35.

[47] Ex. 1 (Sterling Dep.) to Defs.' Mot. for Summ. J. (Doc. 8-1) at 25:1–26:5.

[48] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 14-2) ¶ 28.

[49] *Id.*

[50] Ex. 21 (Sterling Scorecards) to Defs.' Mot. for Summ. J. (Doc. 8-11).

[51] Ex. 22 (Howell Scorecards) to Defs.' Mot. for Summ. J. (Doc. 8-11) at 3–10.

[52] *Id.* at 1–2.

contention.  And, when that didn't achieve his desired result, he selected Ms. Howell despite Ms. Sterling's higher cumulative score.

Ms. Sterling also believes she knows the reason that Dr. Wallace acted as he did.  She alleges that Dr. Wallace unlawfully discriminated against her.  More specifically, Ms. Sterling claims that Dr. Wallace decided not to hire her because he thought that she might need to take FMLA leave in the future to help care for her sick mother.  To be clear, Ms. Sterling is not arguing that Dr. Wallace's decision was a punishment for Ms. Sterling's initial plan to take FMLA leave on May 8, 2018.  Nor is Ms. Sterling arguing that Dr. Wallace's decision was punishment for any other FMLA leave that Ms. Sterling had actually taken in the past.  Ms. Sterling's sole argument is that Dr. Wallace didn't hire her because he didn't want someone who might take FMLA leave during her tenure in the Coordinator position.[53]

## DISCUSSION

Two questions are raised when a government official invokes the defense of qualified immunity at the summary-judgment stage.  One question is simply the normal summary-judgment analysis, i.e., whether a rational juror could conclude that the government official violated the applicable law.[54]  The other question—unique to the qualified-immunity context—asks whether the applicable law was so "clearly established" that the government official is either a complete nincompoop or must have known that his or her conduct violated that law.[55]  If the answer to either

---

[53] The October 2020 Opinion and Order never precisely explained Ms. Sterling's theory of FMLA discrimination. That's quite understandable: The nub of Ms. Sterling's FMLA claim lacked precision last time around.  But, during oral argument at the Eighth Circuit and again during the post-remand hearing in this Court, Ms. Sterling was unambiguous as to her sole theory of FMLA discrimination.  Eighth Cir. Oral Arg. Audio at 0:17:00–0:18:00 ("The theory is that he didn't want to hire somebody, or promote somebody, into that position that was going to be taking time off to deal [with] cancer for her mother."); Aug. 12, 2022 Hr'g Tr. (Rough) at 4 (clarifying that "the only claim" is that Dr. Wallace "form[ed] the thought in his mind that she was going to [take FMLA leave] in the future and that he was not hiring her ultimately because he was worried about the future").

[54] *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014).

[55] *Mullenix*, 577 U.S. at 11–12.

question is "no," then qualified immunity is appropriate.  A court may answer these questions in whichever order it chooses.[56]  And, although Supreme Court and Eighth Circuit precedent don't require it, my inclination is to begin with the straightforward question about the existence of a statutory violation.  This avoids a vicious cycle where it never becomes "clearly established" whether certain conduct violates the law.[57]

## I.    FMLA Discrimination

Ms. Sterling claims that Dr. Wallace refused to hire her because he thought she might take FMLA leave in the future.  In the Eighth Circuit, this would be considered an "FMLA discrimination" claim.[58]  An FMLA discrimination claim is analyzed in the same manner as Title VII discrimination claims.[59]

---

[56] *E.g.*, *Tolan*, 572 U.S. at 656.

[57] *E.g.*, *Mullenix*, 577 U.S. at 11–12 ("We address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place . . . ."); *Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 996 (8th Cir. 2021) ("[O]ur inquiry begins and ends with the clearly established prong.").

[58] The Eighth Circuit has recognized three different claims under the FMLA.  First, there is an "entitlement" claim under 29 U.S.C. § 2615(a)(1).  *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).  Section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny" an employee's FMLA rights.  Everyone agrees that Ms. Sterling is not raising an entitlement claim in the case at bar.  That makes sense: It is undisputed that Ms. Sterling wasn't denied any benefit to which she was entitled under the FMLA.  *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013) (entitlement claim requires proof that employer denied the employee benefits under the FMLA).  Second, there is a "retaliation" claim under 29 U.S.C. § 2615(a)(2).  *Pulczinski*, 691 F.3d at 1005–06.  Section 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA.  There's no evidence in this case of Ms. Sterling opposing any practice made unlawful by the FMLA.  So everyone agrees that Ms. Sterling is not raising a retaliation claim in the case at bar.

Third, and most importantly for our case, there is a "discrimination" claim.  The Eighth Circuit candidly acknowledges that the "textual basis for such a claim is not well developed . . . ."  *Pulczinski*, 691 F.3d at 1006.  It has suggested that, perhaps, the claim can be grounded in "the rule of § 2615(a)(1) that an employer may not interfere with, restrain, or deny the exercise of or the attempt to exercise rights defined by the FMLA."  *Id.* (quotation marks and citation omitted).  In any event, and regardless of where the rule comes from statutorily, the Eighth Circuit has said that FMLA discrimination occurs "when an employer takes adverse action against an employee because the employee exercises rights to which he [or she] is entitled under the FMLA."  *Id.*  This precedent is binding on me.

Ms. Sterling's claim is an FMLA discrimination claim.  That's how the parties present it.  Aug. 12, 2022 Hr'g Tr. (Rough) at 4.  That's how the judge initially assigned to this case analyzed it.  October 2020 Op. & Order (Doc. 19) at 21–26.  And the Eighth Circuit did not suggest that framework was wrong.

[59] *Pulczinski*, 691 F.3d at 1007.

Because Ms. Sterling has not provided direct evidence of discrimination, she must first establish a prima facie case.[60]  At summary judgment, this means she must produce evidence from which a rational juror could rule for her on each of the following three elements: (1) Ms. Sterling "exercised rights afforded by" the FMLA; (2) Ms. Sterling "suffered an adverse employment action"; and (3) "there was a causal connection between her exercise of rights and the adverse employment action."[61]  Once Ms. Sterling establishes a prima facie case, the burden shifts to Dr. Wallace to "offer a legitimate, non-discriminatory reason for [his] actions."[62]  If Dr. Wallace meets his burden of production, Ms. Sterling must put forth evidence from which a rational juror could conclude that Dr. Wallace's "stated reason was mere pretext for FMLA discrimination."[63]

Most of the burden-shifting analysis is easily performed without recreating the wheel. In her summary judgment ruling, the initial judge assigned to this case concluded that "Ms. Sterling makes a submissible case that she suffered an adverse employment action when not hired for the Coordinator position."[64]  Likewise, the judge found the causal-connection prong satisfied by the combination of (1) the "close temporal proximity" between Dr. Wallace learning of Ms. Sterling's FMLA needs and the adverse employment action and (2) Dr. Wallace's decision to essentially ignore the fact that his partners on the interview committee had scored Ms. Sterling higher than Ms. Howell.[65]  And, while acknowledging that Dr. Wallace "articulate[d] a legitimate,

---

[60] *See Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008).

[61] *Id.* (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)).

[62] *Brandt v. City of Cedar Falls*, 37 F.4th 470, 480 (8th Cir. 2022).

[63] *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 835 (8th Cir. 2020).

[64] October 2020 Op. & Order (Doc. 19) at 21.

[65] *See id.* at 21–22.  The judge initially assigned to this case found the causal-connection prong satisfied because the May 2, 2018 email from Ms. Sterling to Dr. Wallace was sufficient for a rational juror to conclude that Dr. Wallace knew of Ms. Sterling's FMLA leave on May 8, 2018 and punished her for it in his May 10 hiring decision.  But, as explained above, there was no such FMLA leave actually taken on May 8, 2018.  *See supra* note 41.  And that's not Ms. Sterling's theory of FMLA discrimination.  Ms. Sterling's theory of FMLA discrimination is that the May 2 email gave Dr. Wallace the knowledge that she might need to take FMLA leave in the future and thus led to Dr. Wallace's

nondiscriminatory reason for hiring someone other than Ms. Sterling,"[66] the judge found that Ms. Sterling created a genuine issue of material fact as to whether Dr. Wallace's justification was pretext for FMLA discrimination.[67]

There is no reason for this Court to disturb those rulings at this time.[68]  But that still leaves the first prong of the prima facie test—whether Ms. Sterling "exercised rights afforded by" the FMLA.[69]  In her summary-judgment ruling, the initial judge assigned to this case found that Ms. Sterling satisfied the exercise-of-rights prong of the prima facie case because it was "undisputed that Ms. Sterling exercised rights under the FMLA" when "she took FMLA leave on May 8, 2018 . . . ."[70]  It has since become clear this finding was the result of the parties' ambiguously drafted statements of material fact.[71]  Ms. Sterling never actually took FMLA leave on May 8, 2018.[72] Ms. Sterling is not even claiming that her initial plan to take FMLA leave that day was the motivation for Dr. Wallace's alleged discrimination.  Instead, she claims that Dr. Wallace was concerned that Ms. Sterling might take FMLA leave in the future.  Reexamination of this first prong is unavoidable because Ms. Sterling has clarified exactly what she is claiming to be the

---

May 10 decision.  Even on this different theory, the Sterling-Wallace email chain referenced by the initial judge in her summary judgment ruling is sufficient to create a genuine issue of material fact as to whether the email chain put Dr. Wallace on notice that Ms. Sterling might need FMLA leave in the future.  That notice, combined with the other aspects of the initial judge's causal-connection analysis, is sufficient to satisfy the causal-connection prong of the prima facie case.

[66] October 2020 Op. & Order (Doc. 19) at 22.

[67] *Id.* at 23–26.

[68] *See supra* note 2.

[69] *Phillips*, 547 F.3d at 912.

[70] October 2020 Op. & Order (Doc. 19) at 21–22.

[71] *See supra* note 41.

[72] *See id.*

FMLA violation.[73]   In light of this clarification, which significantly recasts the entire claim, I cannot simply adopt the initial judge's conclusions as to the first prong.

Can an employee's potential (but unexpressed) need to exercise FMLA rights at some undefined point in the future be considered an exercise of rights for purposes of this first prong? The Eighth Circuit has not addressed this question yet.  So far, every FMLA discrimination case in the Eighth Circuit has involved (1) the employee's prior exercise of FMLA rights, (2) the employer's certainty that the employee will take FMLA leave in the near future, or (3) both.  No Eighth Circuit case has involved an employer taking an adverse action against an employee solely because the employer has inferred that the employee might take FMLA leave at some undefined point in the future.

The closest the Eighth Circuit has come to answering this question is its 2012 decision in *Marez v. Saint-Gobain Containers, Inc.*[74]   In *Marez*, the employee told her supervisor that "she would require FMLA leave for her husband's upcoming surgery."[75]   The employee "did not know the date of the surgery and thus did not know when she would require" FMLA leave.[76]   The

---

[73] *See supra* note 53 and accompanying text.

[74] 688 F.3d 958 (8th Cir. 2012).  Throughout *Marez*, the Eighth Circuit referred to the plaintiff's claim as a "retaliation" claim and cited 29 U.S.C. § 2615(a)(2).  *Id.* at 963.  Prior to *Pulczinski* (decided one month after *Marez*), the Eighth Circuit did not use consistent terminology in regard to the various claims available under the FMLA.  *Pulczinski*, 691 F.3d at 1005–06.  "Entitlement" claims were also called "interference claims."  *Id.* at 1005.  And "retaliation" was used to refer to both a true FMLA retaliation claim under 26 U.S.C. § 2615(a)(2) as well as the judicially created "discrimination" claim recognized by the Eighth Circuit and other courts of appeal.  *See Phillips*, 547 F.3d at 913–14 (Colloton, J., concurring).  It is also unclear, as noted by the *Pulczinski* Court, whether an FMLA "discrimination" claim arises directly from the statutory text and, if so, in which specific provision it is based.  *Compare Pulczinski*, 691 F.3d at 1006 (stating that an FMLA discrimination claim "likely arises under the rule of § 2615(a)(1)"), *with Marez*, 688 F.3d at 963 (basing the claim in § 2615(a)(2)), *and Phillips*, 547 F.3d at 909 (same).  Despite this confusion, *Pulczinski* made clear that cases in which a plaintiff alleges that an employer took an adverse action against the employee because of the employee's FMLA leave are discrimination cases, regardless of whether the court used the "retaliation" or "discrimination" moniker.  691 F.3d at 1006.

[75] 688 F.3d at 961.

[76] *Id.*

employee simply told her supervisor that she would need FMLA leave "soon."[77]  Two days after this conversation, the employee was called into a meeting with her supervisor, the human resources manager, and the operations manager.[78]  The employee was terminated in that meeting.[79]  The employee brought suit alleging that she was discriminated against based on "her request for future" FMLA leave.[80]  A jury found in the employee's favor, and the Eighth Circuit upheld the verdict.[81]  In affirming the *Marez* jury's verdict, the Eighth Circuit described the exercise-of-rights issue as the employee's burden "to show that she had notified [the employer] of her intention to take FMLA leave . . . ."[82]  So, even though the employee never actually took leave (because she was fired before she could), she still met her exercise-of-rights burden because the act of notifying an employer of forthcoming FMLA leave is itself an exercise of rights under the FMLA.[83]

Ms. Sterling's case is distinct from *Marez* in two important ways.  First, Ms. Sterling never expressly told Dr. Wallace that she would certainly be taking FMLA leave in the near future.  Indeed, Ms. Sterling's theory is that Dr. Wallace independently inferred that Ms. Sterling might take FMLA leave at some undefined point in the future—because Dr. Wallace knew from the May 2 email that Ms. Sterling's mom had cancer and that Ms. Sterling at least once contemplated going to the doctor with her mom during work hours.  Second, Ms. Sterling does not argue that any past exercise of her FMLA rights caused Dr. Wallace to discriminate against her.  The exercise of FMLA rights that Ms. Sterling now relies on (i.e., missing work, or even just asking to miss work,

---

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.* at 961 n.2.

[81] *Id.* at 960.

[82] *Id.* at 963.

[83] *Id.*; *see also Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1016 (8th Cir. 2013).

so that she could take her mother to a doctor's appointment) had not yet occurred and was essentially speculative when Dr. Wallace decided not to hire her.

Do these distinctions doom Ms. Sterling's claim of a statutory violation? They do not. At its core, an FMLA discrimination claim prohibits employers from "consider[ing] an employee's use of FMLA leave as a negative factor in an employment action."[84] Employers are therefore not allowed to engage in "manipulation[s] . . . to avoid responsibilities under [the] FMLA."[85] From this, it logically follows that the past exercise of FMLA rights is not a necessary ingredient for FMLA discrimination claims. It is enough for the employer's adverse action to have been motivated by the employer's perception that the employee might take FMLA leave in the future.

The Eighth Circuit has never held that an adverse employment action causally connected to the potential exercise of FMLA rights in the future is, on its own, enough to support a prima facie case of FMLA discrimination. But that doesn't tell us that much. It has never faced a case that presented this particular issue on the merits. It is clear, however, that the Eighth Circuit generally treats an FMLA discrimination claim like employment discrimination claims available under other statutes.[86] And there's no doubt that Dr. Wallace's alleged misconduct would be unlawful if this were a Title VII religious discrimination case. Consider the following example from the Supreme Court:

> [S]uppose that an employer thinks (though he does not know for certain) that a job applicant may be an orthodox Jew who will observe the Sabbath, and thus be unable to work on Saturdays. If the applicant actually requires an accommodation of that

---

[84] *Jackson v. City of Hot Springs*, 751 F.3d 855, 861 (8th Cir. 2014) (quotation marks and citations omitted).

[85] *Phillips*, 547 F.3d at 911 (discussing an entitlement, or "interference," claim under 29 U.S.C. § 2615(a)(1)); *see Pulczinski*, 691 F.3d at 1006 (stating that an FMLA discrimination claim "likely arises under the rule of § 2615(a)(1) that an employer may not interfere with . . . the exercise of or the attempt to exercise rights defined by the FMLA." (quotation marks omitted))

[86] *See, e.g.*, *Scruggs v. Pulaski Cnty.*, 817 F.3d 1087, 1094 (8th Cir. 2016) (using same prima facie framework for ADA and FMLA claims); *Pulczinski*, 691 F.3d at 1007 ("This court has considered FMLA discrimination claims under the *McDonnell Douglas* burden-shifting framework that is applied in Title VII cases.").

14

religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII.[87]

Likewise, Ms. Sterling's theory of liability would work for a disability discrimination claim under the Americans with Disabilities Act. The ADA prohibits an employer from discriminating against a job applicant because the employer perceives the applicant as mentally or physically impaired.[88] And the employer is liable regardless of whether his or her inference was accurate.[89] So, under both Title VII and the ADA, it is unlawful for an employer to reject a job applicant to avoid the possibility that the applicant will exercise statutory rights in the future. There's no logical reason to reach a different result in this FMLA case, at least not in light of the governing Eighth Circuit precedent on FMLA "discrimination" claims—precedent that pays less attention to the specific words of the FMLA statute than may be warranted.

## II.  Qualified Immunity

Qualified immunity is a defense that "gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'"[90] It "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights . . . ."[91] The Supreme Court has routinely explained that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[92]

---

[87] *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773–74 (2015).

[88] 42 U.S.C. § 12102(1)(C), (3); *see also Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1113 (8th Cir. 2016).

[89] *See Canning v. Creighton Univ.*, 995 F.3d 603, 615 (8th Cir. 2021) ("[A] person is regarded as disabled if her employer mistakenly believes that she has a physical impairment . . . .").

[90] *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

[91] *Mullenix*, 577 U.S. at 11 (quotation marks and citations omitted).

[92] *E.g.*, *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In short, Dr. Wallace "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it."[93]  This requires that, at the time of Dr. Wallace's decision not to hire Ms. Sterling, there existed "either 'controlling authority' or a 'robust consensus of cases of persuasive authority'" that "placed the statutory . . . question confronted by [Dr. Wallace] beyond debate."[94]  Given the Court's analysis in Discussion Section I, it should come as no surprise that Dr. Wallace is entitled to qualified immunity.  In May of 2018, it was not clearly established that the FMLA prohibited his decision not to hire Ms. Sterling because he inferred that she might have to take FMLA leave in the future.

Ms. Sterling's claim is simply too novel to skirt qualified immunity.  To be sure, overcoming qualified immunity does not require Ms. Sterling to find a factually identical case.[95]  But any distinctions must be so immaterial that the "unlawfulness of [Dr. Wallace's] conduct" was still "apparent."[96]  And the two differences that distinguished Ms. Sterling's case from the Eighth Circuit's decision in *Marez* also materially differentiate her case from every other relevant FMLA discrimination case.[97]  While those differences do not doom her statutory claim, they do make the alleged manner of violation distinct from every previously recognized violation.

Only three circuit court cases, each from outside the Eighth Circuit, involve an employee alleging that he or she was subjected to an adverse employment action due to FMLA leave that

---

[93] *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014).

[94] *Id.* at 779–80 (quotation marks and citations omitted).

[95] *Ziglar*, 137 S. Ct. at 1866–67.

[96] *Id.* at 1867.

[97] "Relevant," in this context, means cases decided before May 10, 2018.  *Plumhoff*, 572 U.S. at 779–80 (stating that cases decided after the defendant's conduct "could not have given fair notice" to the defendant (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam))).

16

might occur.[98]  In *Kelly v. University of Pennsylvania Health Systems*, the employee, who had recently returned "from three-month consecutive leave," told her employer that "she may need similar consecutive leave in the future."[99]  In *Bartels v. Southern Motors of Savannah, Inc.*, the employee "indicated to the [employer] that he would need time off in the future to help his wife through [a] complicated pregnancy," but he "did not request any specific days off."[100]  And in *Sarnowski v. Air Brooke Limousine, Inc.*, the employee was fired after he told his supervisor that he "might need" FMLA leave for a heart surgery.[101]

These three cases don't move the needle for Ms. Sterling.  *Kelly* was premised on more than just the employee's potential future FMLA leave; she was also alleging that the discrimination was based on her previous three-month stint of FMLA leave.[102]  In *Bartels*, the Eleventh Circuit merely assumed that the employee had made out a prima facie case and then granted the employer's motion for summary judgment because the employee could not establish pretext.[103]

---

[98] Ms. Sterling cites a compilation of district court cases, none of which is relevant to the qualified-immunity analysis in this case.  Pl.'s Suppl. Br. (Doc. 41) at 3–4.  Two of the cases were decided well after May of 2018.  And the rest are plainly distinguishable from the facts of Ms. Sterling's case.  *Davidson v. Evergreen Park Cmty. High Sch. Dist. 231*, No. 15 C 0039, 2017 WL 2243096, at *9 (N.D. Ill. May 23, 2017) ("There is also no evidence that [employer's] termination of [employee] was preemptive retaliation for his potential future use of FMLA leave."); *Shreve v. N.J. Motor Vehicle Comm'n*, No. 15-7957, 2016 WL 5334661, at *5 (D.N.J. Sept. 22, 2016) ("Plaintiff has alleged that she was entitled to FMLA leave . . . and as a result of taking this leave, [employer] . . . terminated her employment."); *Karanja v. BKB Data Sys., LLC*, No. DKC 14-0573, 2015 WL 993462, at *3 (D. Md. Mar. 4, 2015) ("Plaintiff alleges that Defendant discriminated against her . . . by terminating her employment after she gave advanced notice of her intent to take maternity leave in June 2013."); *Corral v. Hersha Hosp. Mgmt., Inc.*, No. 12-cv-02375, 2012 WL 4442666, at *6–7 (D.N.J. Sept. 24, 2012) (plaintiff alleged discrimination after "she notified her employer of her intent to take leave approximately six months later"); *Hopkins v. Grant Thornton Int'l*, 851 F.Supp.2d 146, 152 (D.D.C. 2012) (plaintiff alleged that he "was terminated because he requested FMLA leave" (quoting Am. Compl. Count 1, ¶ 32)); *Gleaton v. Monumental Life Ins. Co.*, 719 F.Supp.2d 623, 626 (D.S.C. 2010) ("Plaintiff . . . requested leave and . . . was terminated."); *Reynolds v. Inter-Indus. Conf. on Auto Collision Repair*, 594 F.Supp.2d 925, 926–27 (N.D. Ill. 2009) (plaintiff had requested FMLA leave); *Walker v. Elmore Cnty. Bd. of Educ.*, 223 F.Supp.2d 1255, 1256 (M.D. Ala. 2002) (plaintiff had "orally requested maternity leave" shortly before being terminated).

[99] 708 F. App'x 60, 63 (3d Cir. 2017).

[100] 681 F. App'x 834, 836 (11th Cir. 2017).

[101] 510 F.3d 398, 400–01 (3d Cir. 2007).

[102] 708 F. App'x at 60.

[103] 681 F. App'x at 838.

Moreover, both *Kelly* and *Bartels* are unpublished opinions and therefore "provide[] little, if any, support for imposing liability based on clearly established law . . . ."[104] *Sarnowski* is an FMLA entitlement case, not an FMLA discrimination case. And in all three cases the employee directly and expressly notified the employer of the potential need for future FMLA leave—the employer was not subjected to personal liability based on an inference drawn from an employee's general comments. Finally, even if each case were directly on point, three out-of-circuit cases don't amount to a "robust consensus of cases of persuasive authority."[105]

It must be acknowledged that the Court is slicing things very thinly. After all, a rational juror could find that Dr. Wallace discriminated against Ms. Sterling because he *thought* (based on an inference) that Ms. Sterling *might* take FMLA leave in the future. And a case like *Marez* clearly establishes that, in the Eighth Circuit, a defendant is prohibited from discriminating against a plaintiff because the defendant *knows* (based on the plaintiff's direct notification) that the plaintiff *will* take FMLA leave in the future. Both situations involve a defendant trying to avoid dealing with a plaintiff's FMLA-protected absences. So the only differences are (1) the defendant's degree of certainty that an FMLA-protected absence will indeed occur and (2) the manner in which the defendant arrived at that degree of certainty. But Supreme Court and Eighth Circuit qualified-immunity precedents require such thin slicing. Under those precedents, the differences just discussed matter for qualified immunity.

Resolving an FMLA discrimination claim is an inherently fact-intensive endeavor. The burden-shifting framework utilized by courts is a tool designed to determine whether there are sufficient facts to allow a rational juror to conclude that a defendant illegally discriminated against

---

[104] *Blazek v. City of Iowa City*, 761 F.3d 920, 925 n.3 (8th Cir. 2014) (citing *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc)).

[105] *See Lane v. Nading*, 927 F.3d 1018, 1023 (8th Cir. 2019).

a plaintiff.[106]   Among other things, that means that slight differences in the facts of each FMLA discrimination case can result in different outcomes as to a defendant's liability.   And the fundamental principle underlying the doctrine of qualified immunity is that government officials are entitled to "fair notice" as to whether their conduct violates the law.[107]   In other words, qualified immunity is meant to give government officials a reasonable ability to "anticipate when their conduct may give rise to liability for damages."[108]   So qualified immunity is often appropriate where slight differences between the facts of each case tend to change the ultimate outcome—i.e., whether the applicable law was violated.[109]   (What, if anything, that means about the general propriety of the qualified-immunity doctrine is a question way above my pay grade.)

Dr. Wallace was not on notice that—given the unique facts of this case—refusing to hire Ms. Sterling could subject him to civil liability for money damages.   The differences between prior FMLA discrimination cases and this case are material enough that, in the fact-intensive context of an FMLA discrimination claim, it was not entirely unreasonable that an "official in [Dr. Wallace's] shoes" would think his conduct was lawful.[110]   It is true the Court concluded above that, on the merits, Ms. Sterling presented a submissible case of FMLA discrimination.   But that conclusion was based on an extension of Eighth Circuit precedent.   And while that extension of Eighth Circuit precedent is logical, warranted, and appropriate, it is not so obvious that Dr. Wallace had a duty to

---

[106] *Ring v. First Interstate Mortg., Inc.*, 984 F.2d 924, 926 (8th Cir. 1993).

[107] *Plumhoff*, 572 U.S. at 779 (quoting *Brosseau*, 543 U.S. at 200 n.4).

[108] *Ziglar*, 137 S. Ct. at 1867 (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).

[109] *Cf. id.* at 1866 ("By its plain terms, the [Fourth] Amendment forbids unreasonable searches and seizures, yet it may be difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered."); *Lyons v. Vaught*, 781 F.3d 958, 961 n.1 (8th Cir. 2015) (noting that the "fact-intensive balancing test" applicable to public-employee-speech claims under the First Amendment "can rarely be considered 'clearly established' for purposes of the . . . qualified immunity standard" (quoting *Bartlett v. Fisher*, 972 F.2d 911, 916–17 (8th Cir. 1992))).

[110] *Plumhoff*, 572 U.S. at 779.

predict it in May of 2018.[111]   Accordingly, Dr. Wallace is entitled to qualified immunity on Ms. Sterling's FMLA discrimination claim.

## CONCLUSION

For the reasons provided above, the Court GRANTS in part Defendants' Motion for Summary Judgment.  Defendant Bentley Wallace is entitled to qualified immunity on the FMLA claim against him.

IT IS SO ORDERED this 28th day of November 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[111] *See Ziglar*, 137 S. Ct. at 1867; *Wilson v. Layne*, 526 U.S. 603, 617 (1999).